Next case this morning is 18-8061 Defenders of Wildlife v. Dept. of Interior. Counsel? Good morning, Your Honors. May it please the Court, Timothy Presso on behalf of Appellants Defenders of Wildlife and Wyoming Wildlife Advocates in number 18-8061. I will be splitting the appellant's time with counsel in number 18-8062 and I seek to reserve one minute of my time for rebuttal. I intend to focus my portion of the appellant's argument on the National Park Service's arbitrary failure to consider the circumstances surrounding the creation of Grand Teton National Park in 1950, but I'm prepared to answer questions about any aspect of the case. This case challenges a National Park Service decision that opened the door for the State of Wyoming to authorize hunting within one of our nation's crown jewel national parks. The challenge decision of... Parties, and that includes governments, have to dot the i's and cross the t's and it seems here that it didn't happen. Well, Your Honor, respectfully... I mean, unless we start following your line of reasoning about implying this and supposing that, Judge Baldock, who I love to quote, sitting here would say if ifs and buts were candy and nuts, we'd all have a Merry Christmas. There's a lot of ifs and there's a lot of buts, but they didn't dot the i's and cross the t's. Well, Your Honor, respectfully, I don't think we're in a situation of just ifs and buts here. We're in a situation where we have a course of conduct of 60 years that was all one way, which was the Park Service had jurisdiction to protect wildlife throughout Grand Teton, including on the inholding properties. If we look back at the source of that 60 years of practice, what we see is there was an agreement at the inception of the modern Grand Teton National Park. Well, there was an oral agreement, apparently, at best. Well, Your Honor, I think what we see is there was a there was an express agreement that Wyoming acceded to the federal position on Wyoming's demand for absolute authority over wildlife within the portions of the of the park that were added in 1950. That was that what is your best case for the proposition that you can have some kind of an adverse possession theory or some kind of adverse theory of regulation? Well, Your Honor, respectfully, I don't think we're asserting an adverse possession theory, but I think no, I didn't mean possession, but some kind of seems a statute of limitations. Well, Your Honor, what kind of cases are out there that support your theory? I would like to come back to recharacterize my theory. But before I do that, I want to answer your question. I think the Brown and Armstrong cases from the Eighth Circuit are the guideposts that we would offer the court to sort this out. And what I think Brown and Armstrong make clear is that when you're in a situation where a state agrees to the creation of the national park with a clear understanding that the federal government intends to prohibit hunting within the park and and and and then this in this case. But that understanding was based on an enabling act, both a federal and a state enabling act. It was based on some legislative action, at least, or some legislative involvement. And that's what we're missing here. Well, Your Honor, I don't think we are missing that because there was a legislative enactment here that followed the creation of Grand Teton when Wyoming essentially embraced the benefits of that compromise by by passing state legislation that swept in the money that was coming to the state from it and under principles of ratification to sweep in the benefits carries with it the burdens. And the governor, the congressional delegation, the entire Game and Fish Commission agreed to some burdens as part of this deal. I don't see that as anywhere close, though, to what we have in the Brown or Armstrong case. That's that was about the tax, kind of the tax implications of that and the government trying to help out to respond to some of the money that had been taken away from Wyoming. But that that's not what we had in in what the 8th Circuit had in the Armstrong Brown case. I grant that's correct, Your Honor. It's different. But the important point is it's a it's a legislative stamp of approval on the deal that was struck. That's our our contention about. Well, let me let me ask you this. Is there any case out there that gives congressional delegations authority to bind a state? Well, you know, I mean, I wouldn't I don't think I can cite a case for you. And that's not really what we're asserting. All right. All right. Well, OK, I'm I'm listening. OK. It was ratification of a deal that was struck and the deal that was struck, though, would have related to the surrendering of land of Wyoming to the federal government. Right. For the park, that was certainly a part of the deal. Well, I mean, that's the part that resulted in money payments to Wyoming. Well, that has nothing to do with the in-hold property that we're talking about, which was not surrendered as part of the park to the federal government. I agree with that, your honor. But but Wyoming's legislature acted against the backdrop of a situation where it was clear that part of what had happened in this compromise was the state had given away its authority to authorize hunting inside those park boundaries to the United States. And we see that from the course of conduct immediately after the act's enactment, when Wyoming is suddenly seeking emergency exemptions from park wildlife protections because hunting seasons were underway when President Truman signed the bill. At that time, there were 18,300 acres of in-holdings in the new park. Not once did Wyoming say what it now says. We have authority to authorize hunting on those in-holdings. Instead, they said, Interior, we need you to bail us out because we can't do anything unless you give us a green light. And that shows, I think, very clearly what the parties understood at that time. And then against that backdrop, the legislature says, essentially, we endorse the deal. We want the benefits. Well, that gives you a course of dealing and that gives you an understanding. But going back to Judge Moritz's question, the only statute that you pointed to was this funding statute. And that funding statute had nothing to do with the in-holding property. So, I mean, how could it ratify anything related to that property when it was, in fact, to the contrary, it was the surrendering of property to the federal government? Your Honor, I'm to the point where I need to cede time to my counsel, but if I could, I'd like to briefly answer your question. And I'll just say that the state legislation occurred against the backdrop of the deal that did include the agreement as to the in-holding property. Are the in-holders parties to this case? No, Your Honor. But my last point is, this is very interesting. The Park Service considered none of it. None of these questions were addressed by the agency in reaching this decision. When was... Wow. Thank you. Sit down. That's fine. Go ahead. I'm trying to respect your, you know, I'm not trying to cut you off. I'm just trying to respect what you want to do. May it please the Court. Good morning. I'm Robert Rosenbaum of the firm of Vaughan and Porter for the National Parks Conservation Association Appellants. And I'd like to address a couple of the points that you've already raised. Just a second. You represent who? Who do you represent? The plaintiffs and appellants in 806-2. Okay. Thank you. And I'd like to reserve two minutes of my time for rebuttal. And I'd also like... Do your interests diverge? Not at all, Your Honor. All right. And I'd also like to bring your attention to the fact that with our reply brief, we filed a motion for leave to file a supplemental appendix. Yes. So, well, the last question, well, the last line of discussion by your co-counsel related to, he started to raise the notion that none of this was considered by the agency. This 1949, 1950 negotiations and that whole backdrop, none of that was considered by them in making their determination in 2014. That's correct. Okay. Well, my argument, not argument, but my question to you is, when was the first time that anyone brought to the attention of the agency the need to consider the 1949 and 1950 negotiations? Yes, Your Honor. I'm glad you asked. Because in early 2015, I submitted to the director of the National Park Service a letter and a supplemental appendix containing all these same documents, and I asked the director to change the decision. I then met with the solicitor's office and the solicitor of the Department of Interior and discussed these matters with them. Now, we moved to include that material in the administrative record, but the district court denied our motion to include that. Well, that gives me what basis to follow up. There's a lot of discussion about post hoc rationalizations here. Well, if they didn't have notice of this, they consider it irrelevant. If they didn't have notice that somebody out there considered it irrelevant until after they issued the letter, then their response to you, by definition, can't be post hoc, because they didn't know that they should, there was anybody who had, that was concerned about that. Let me point out, Your Honor, two things. First of all, the Brown and Armstrong cases, and I'd like to address Judge Moritz's argument, I mean, point about that, but those cases were very well known within the National Park community, and I do a lot of work in the National Park community, and I knew about those cases. And... But then there's a question of whether they're relevant, and that's the point. Yes, Your Honor. But if you knew about those cases, and if you knew anything about the controversy, there was legislation, a presidential veto, there was a litigation by the State of Wyoming against the creation of the monument that preceded the park, if you knew anything about that, and you read these cases, you ask the question which I ask, which is, what happened here? Now, when my colleague... In that context of what happened here, is the inholders are not a party, and is Wyoming a party? The State of Wyoming? Yes, they're an innovator, Your Honor. The State of... And are they represented here today? I believe so, Your Honor. Thank you. So my colleague went to the National Archives and found some of these documents, but not all of them, and was told, there's a Department of Interior bound volume containing these documents, one copy of which is in the office, the regional office of the National Park Service in Denver, Colorado, the same office from which all these letters were sent. Now, we couldn't get access to that, but she went to Wyoming and got access in the archives there. So if they had done the first line of inquiry that seems to me you would ask, 60 years, why did the Park Service consider for 60 years that it had this jurisdiction? The language they used was they assumed. Sorry? They assumed that they had jurisdiction, and so what? I mean, people make assumptions all the time. I mean, I don't know why, and it turns out not to be true, if that's your contention. But the point I'm trying to drill down on is, this is not like some typical, well, many agency matters in which you have something bubble up, and there's a request for, let's say, rulemaking, and there's a request for comments, and then there are comments made, and then the agency issues a final order, and then there's somebody who comes and says, hey, hey, hey, you didn't consider this issue that we brought to your attention that was so important. Well, it's not like Brown and Armstrong are directly on point in this situation. They just aren't. And you can infer that they apply here, but they're not directly on point, and so why couldn't the government say they're irrelevant, which is their position now, and so there's no post hoc rationalization is the point I'm getting at. Well, of course, that's your privilege to have that view. And I'm not taking that view. I'm trying to test that view with you. Yes. Well, I would say this. This was not a one-off letter. This was a process that went on for years. It was in 2011 that the state first began to assert that it could allow wolf hunting on the inholdings in the park, and from that time, the solicitor's office in Denver and the solicitor's office in Washington were deeply involved in these discussions. Now, attorney-client privilege has been asserted, so there's nothing in the record about what they said. We don't know what they said or did, but the department now concedes that they never considered this, and I'm running into my rebuttal time, but I do want to say one thing about Brian Armstrong. It's very important. I believe that the legislation, the state legislation at issue in that case is totally irrelevant or, I would say, supports our position, not the other side, because the question was, what did the Minnesota legislature intend to do? And it's clear as a bell that they did not intend to cede jurisdiction as to the waters. First of all, the district court in Brown, which was decided only four years after that state legislation was adopted, explained why they didn't, which was because it was great hunting ground. Secondly, the state intervened or moved to file an amicus brief, I think it was, in the Brown litigation and argued that they had not ceded. And then some years later, they adopted a statute saying we never ceded. So the statute that was at issue there, yes, there was legislative involvement, but it was involvement only to donate the land. The session part of that statute argues against the fact that this case is different from that case. And I would say something else. Here, until 1953, which you've already discussed with my colleague, here you had a situation in which the legislature was well aware of what was going on. It was a matter of great public interest, and yet they never objected. And I would say one more thing, and that is JA1116. This is a letter of September 20, 1950, from the head of the Wyoming Game and Fish Department to the Secretary of Interior about that season, 1950. It's quite evident to me that we're going to need additional time on this case. I just don't know how we're going to do it, so I'm going to have to confer with my colleagues. So if you could, your time is up for now. Let's leave it at that. We'll hear from the other side, and then we'll take it from there. Good morning. May it please the Court. I'm Kevin McCardle on behalf of the Park Service, and I'll be splitting Appellee's time today with Mr. Peterson, representing the State of Wyoming. I plan to take no more than 12 minutes. So this case comes down to one basic and unassailable point. The only entity who can cede legislative jurisdiction over the lands in Wyoming to the federal government is the Wyoming Legislature. In CLEPE, the Supreme Court explains what legislative jurisdiction means in this context. The Court explained that legislative jurisdiction held by the United States is derivative legislative power that has been ceded from the state. In Wyoming, as in most states, the legislative power is vested exclusively in the legislature. So the legislature is the only entity that can give it away. The legislature took no action here to cede its legislative powers over Grand Teton's private inholdings to the federal government. Therefore, the federal government does not have legislative jurisdiction over those areas, and the wildlife regulation doesn't apply. That's the entire case. The plaintiffs put up a host of other arguments, but ultimately they're all immaterial. And I'll focus on one of them, which is the only one that really acknowledges that Wyoming's legislature has to approve or authorize any session, and that's this ratification theory. The theory is that in 1953, when Wyoming passed a statute relating to the park, they ratified some prior unwritten session agreement where Wyoming's executive officials agreed to cede power over inholdings. That argument fails on multiple grounds. First, let's take a look at the 1953 Wyoming statute. It's an administrative housekeeping measure. It provides for the disbursement of funds from the state treasurer to the treasurer of Teton County and then to the appropriate tax districts. It has nothing to do with legislative jurisdiction. It doesn't purport to ratify anything. It has nothing to do with wildlife management. And under Wyoming laws, Wyoming law, courts don't read a statute, expand a statute to cover matters that it doesn't explicitly address. The second problem with the ratification theory, we're not dealing here with a run-of-the-mill commercial contract. The theory is that there was this implied unwritten agreement to give away the state's sovereign power, including its traditional trustee and police powers over wildlife within its borders. Now, the Supreme Court addressed this in the home telephone case cited in our brief. They said the only instances in which they've recognized a ratification of a contract of that nature is when the legislature in specific terms approved and endorsed the contract. Obviously, Wyoming's 1953 statute doesn't pass that test. Now let's go to what the plaintiffs rely on, the restatement of agency generally applicable to routine run-of-the-mill commercial contracts. Even that doesn't save them because to the extent the 1953 Wyoming statute recognized a benefit, it wasn't a benefit provided by some unwritten, unauthorized oral agreement. It was a benefit provided by the statute. Section 5 of the statute provided for funds to go to Wyoming, and that's what Wyoming's statute implemented. And of course, the Enabling Act itself did not condition Wyoming's receipt of those funds on a session of legislative jurisdiction. And finally, even ... But it did cede jurisdiction over those lands for all other purposes, did it not? The statute? Yes, the state of Wyoming by that statute. For example, for law enforcement purposes, what government has jurisdiction over a crime committed in one of those in-holdings? So I think your Honor is referring to the 1977 session statute. Let me just ask just generally today, if there is a crime committed in one of those in-holdings, who has jurisdiction? Is it federal or is it state? On the private in-holdings, it would be state because the state has ceded, in a 1977 statute that's discussed in the briefing, it has ceded concurrent jurisdiction to the United States over the lands in the park that are dedicated to park purposes. So private in-holdings don't meet that requirement because they're not dedicated to park purposes. And has there ever been an example that you could cite us of such an occurrence, or has there never been such, just so far as you know? An example of the state enforcing criminal laws on in-holdings? Yes, right. I'm not aware of that, Your Honor. But what I can say, and this bears on this course of conduct argument, and I think Judge Holmes hit the nail on the head. Yes, the Park Service officials presumed for many years, but an assumption without action is not a course of conduct or a practice. Here's the actual action that the Park Service took. Before 1949, it promulgated a regulation, its wildlife regulation. That regulation, which is in the record, it doesn't apply to private lands anywhere in the national park system, except for a specific list of parks, not including Grand Teton. That was the institutional decision that the Park Service made. That was the regulation that was on the books from 1949 to 1983. And next, there's no evidence in this record that the Park Service had a practice of applying the wildlife regulation to private lands. No evidence that we ever ticketed somebody or prosecuted somebody for violating the regulations. And finally, there's no indication that the Park Service ever squarely confronted the question, do we have legislative jurisdiction over in-holdings or not, until the events of giving rise to this lawsuit arose. And in that circumstance, the agency did exactly what it was supposed to do. It looked to see if Wyoming's legislature had ceded its powers over the in-holdings. Having concluded that it did not, the Park Service correctly concluded that the wildlife regulation didn't apply. And as far as post hoc justification, we're not asking this court to substitute some new justification for the agency's decision. The agency's decision articulates the only justification that matters, and that's that Wyoming's legislature has not ceded its power over in-holdings. Well, I don't understand that to be their argument. Their argument is that this was a relevant factor that you needed to consider, and that before you made the decision you made, quite apart from the substance of the decision you made, you needed to show you rationally considered variables that were important to that decision. And their argument is the 1949-1950 negotiation, and the course of dealing related to that was a relevant factor. That's the argument. That is their argument. And when they came into the litigation and made that argument and asked the court to accept those documents, we were not required to simply confess error and take a remand. We were entitled to look at the documents, and if we disagreed with their legal and factual characterization of the documents, we were allowed to put forward our arguments, and the court could make a decision. And that's exactly what happened. Yeah, but their point would be that you should have done that before you issued the 2014 letter. If I understood in particular as I, in the, as iterated today, Brown and the other case where they were on the books, and their point would be, well, you know, it's a reasonable person would have looked at those cases and said, I've got to at least grapple with them and explain why they aren't relevant here. Well, first of all, the Park Service is not required to consider documents that are immaterial to the question of whether a session occurred, and that's our whole point. These documents are immaterial, and we're not required to consider them, because no matter who said what during the negotiations, they couldn't make a session because they didn't have any authority to do it. And I take it it's your position that one should read Brown and Armstrong as being linked to statutes, and therefore, that that would be, that's what was going on there, and therefore, that's not what we have here, and therefore, that they really wouldn't have been apposite anyway. Right. I mean, the Park Service is not required to review legal case law, but putting that point aside, those cases are readily distinguishable, because they sure are. Well, I mean, if there was a case that was on point that said, you can't do A, and you issue an opinion that says, I can do A, you've got a problem, don't you? Okay. Let's assume that that's the case, then. The key point is this. The Eighth Circuit most certainly did not hold that State executive officials can orally or unilaterally see legislative power without the legislature's approval. On the contrary, the Court's analysis turned on two factors, both of which are absent here. First, the Court said that Congress clearly demonstrated in the Enabling Act its intention to exercise jurisdiction over the park's waters. We don't have that here. Second, the Minnesota enacted comprehensive Well, just substitute water and livestock and wildlife, rather, and that's exactly what you've got here. Well, no. Congress, the Court, the Eighth Circuit said that the federal statute in Brown and Armstrong clearly demonstrated Congress's intent to exercise regulatory jurisdiction over waters. Right. There's nothing in the 1950 Enabling Act here that clearly demonstrates Congress's intent to exercise jurisdiction over inholdings. That's why plaintiffs are resorting to this alleged oral informal agreement, because the statute doesn't reflect what they're arguing. Isn't your first position about Armstrong that you think it's the wrong result, or are you even suggesting that? Well, the Court doesn't need to go there. I understand, but I mean, so you're not making the argument that really what they did have there in that case, which was not direct legislative action, was not sufficient? Right. We're not arguing that Armstrong was wrongly decided. We're arguing that the two factors that the Court relied on aren't present here. And Second factor? Excuse me? Second factor being? I'm sorry? You've said the first factor. The second factor is what? The second factor was the state's comprehensive enabling legislation, which endorsed Congress's objectives in creating the park, recognized that waters were essential to the park, ceded land to federal government, and ceded legislative jurisdiction over that land. Isn't that more important than even the first factor in terms of you've got state legislative activity at least? Yes, but they're equally important. I mean, I think the only way that the Court could have found a session over the waters was by the clarity of the congressional legislation that the state legislation was endorsing. And here, of course, we don't have that. We have a housekeeping measure that moves funds from one entity to the other. Well, it does seem anomalous that the state of Wyoming would recognize the purpose of the park and cede authority over the lands of the park to the federal government and somehow leave a little shooting gallery in the middle of it where somebody can just sit around and hunt elk almost like shooting ducks. I mean, this is a vast park. And it does seem anomalous that the state of Wyoming would leave a little circle in the middle for them to exercise jurisdiction over the wildlife in that donut hole in the middle of the park. And then we are told, do nothing whatsoever to assert that type of wildlife jurisdiction in the intervening, what, 40 years, 60 years, whatever we are told? Well, I think at the very beginning of Your Honor's question, there was a reference to Wyoming giving land to the park. That didn't occur to me. Ceding jurisdiction. Well, Wyoming hasn't done that. At all for any purpose. No, except, I'm sorry. Thank you. I misunderstood the argument. Except for the 1977 session statute, which would only apply to the land. That's what I was referring to. Which would only apply to? To lands that were dedicated to park purposes. And the Park Service concluded that private in-holdings don't meet that requirement, and that's undisputed on appeal. I see I have only two minutes and 20 seconds left, but I want to give Wyoming a chance to speak as well. Thank you. Good morning, Your Honors. Eric Peterson on behalf of the state of Wyoming. My time is short, and of course, I had a rhetorical presentation ready for you, but I'd like to just address- Give us a flavor of it. Well, I'd like to address Judge Lucero, your comment. Which is, doesn't this seem anomalous? And that's understandable. Grand Teton is different. Does it seem anomalous that we allow elk hunting in Grand Teton National Park? Does it seem anomalous that we temporarily deputize individuals, private citizens, to be park rangers in order to hunt elk? We do. It's what Congress intended. It's anomalous, but it's the law, and it is what it is. And when Wyoming made this agreement, they did not intend to convey any rights to the federal government with regard to either the private or the state in holdings within Grand Teton. And in the intervening 40 to 60 years, give us some examples that demonstrate that intent. I think the best way to think of that, Judge Lucero, is that as hard as this is to seem, and I know you're all familiar with Wyoming and how few people we have up there, that simply the issue didn't come up. That's what's not in the plaintiff's briefs. How many conflicts there were and how many disputes about the authority. It didn't exist. It came up in 2014, 2015, because it was precipitated by the wolf delisting. Before that time, the good people of Wyoming were letting things be and proceeding as they were. And to go to Judge Holm's point, that feeds into this whole assumption of it was an assumption. It wasn't a continual exercise of federal power. It was, well, we kind of figured it was this way, but now that we actually have to look at it, we have looked at it. And the federal government rightly decided that they don't have the authority currently to regulate wildlife on in-holdings. The good people of Wyoming thought that they were, at that point, at least up until 2014, that they would be prosecuted by the U.S. Attorney's Office if they hunted on private in-holdings. That question was raised in 2014, 2015, but there's no evidence that that was the case 20, 40, 60 years beforehand. In Wyoming... I thought it was understood pretty much, but maybe not. I don't think that's in the record, Your Honor. Okay. And here's where the issue of time comes up, because I know I have some questions. I mean, we extend three minutes, so that's a little time. We're going to extend you an additional three minutes, and let's see where... Thank you, Your Honor. What I'd like to know is this. After this issue arose, did the state of Wyoming begin to enforce the hunting of wildlife in these in-holdings? That's my understanding, Your Honor, so there are two... Oh, wait a second. I mean, that's not going to get you anywhere. Understandings... I would like to have facts and answers. Did the state of Wyoming then undertake to enforce the wildlife laws? Given that this case is an Administrative Procedure Act case, and the court is limited to the facts that are in the record, I'm unaware of facts in the record that show that that is the case. It is, however, my understanding that that is what has happened in the past, and certainly is what is occurring today. I'd also like to briefly, if I could, address the fact that there's... ...to whether at any time in the past, prior to 2014, the state of Wyoming exercised the wildlife enforcement laws, the wildlife laws in those in-holdings. I don't believe that's reflected in the record, Your Honor, and I believe the reason is because it was irrelevant to the Park Services analysis. At the end of the day... Did somebody offer evidence, and it was ruled irrelevant? I'm not aware of that, Your Honor. I don't believe that occurred. And again, just to finish with that bit of rhetoric, at the end of the day, we're nibbling, and rightly so, on some interesting questions here, but at the end of the day, did the elected representatives of the citizens of Wyoming choose to surrender permanently their sovereign rights over non-federal land? The answer clearly is no, and because that the answer is no, the Park Services decision must be upheld. Let me just ask you a question. Is... The district court relied in part upon a harmless error analysis to support its decision. I don't see either you or the federal government making any such argument now. I take it that is not part of your case. It isn't, Your Honor, and I appreciate you raising that up because it's not necessary. It's not necessary for the decision. All right. I believe that the judge covered a lot of the grounds as to why the Park Services decision should be upheld, but that is not one that is necessary for this court to uphold the decision. So if a crime, and this is not theoretical, if a crime happens today, or that sometime in the future, in these private inholdings, or historically were private inholdings, which raises another question in my mind, but that went first. If it happens in these particular inholdings, does Wyoming have exclusive jurisdiction? So, of course, the distinction there is whether or not the crime is related to wildlife. No, any other kind of crime. Any crime. Okay. There's concurrent jurisdiction, and what happens is a practical matter is the state of Wyoming cooperates with our federal partners in order to prosecute that as appropriate. It could be dual prosecution or individual, depending on prosecutorial discretion. Concurrent jurisdiction even as to the private lands? I thought that the 1970 statute said for, gave concurrent jurisdiction to Park Purposes. Yes. And not for private land, though. That's correct, Your Honor. So I hesitate to engage in extreme hypotheticals, but if it was vehicular manslaughter, for example, that would, in my opinion, and I believe the state's opinion, would not be something that's dedicated to Park Purposes, and therefore Wyoming would have sole jurisdiction. Okay. Now, is your answer true for private in-holdings that have been acquired since the creation of the park? It would depend on who acquired them, Your Honor. Well, by the federal government. So, yes. So, for example, we have that exact situation here. The state had two 640-acre parcels. During the pendency of this litigation, the state sold one of those parcels to the federal government. That, the federal government now has a proprietary interest in that property, and therefore has the authority to do what they wish. Thank you. Questions? Answer? Drew? All right. We will send you four minutes and 15 seconds, which is equivalent to your adversary's side. Thank you. Thank you. First, I'd like to address the issue of state authority. My friend argues that only the legislature in California can cede jurisdiction. But, in fact, here the governor was directly involved in the negotiation approval of this agreement. Well, but if we don't accept your proposition that you could have non-legislative action here, I don't understand how that makes any difference if the governor was involved. He doesn't have legislative authority. Well, your honor, the Constitution of the state of Wyoming gives the governor authority to negotiate agreements with the federal government. And that's exactly what happened here. The other side views this issue. Would you repeat that, please? Yes. The Constitution of the state of Wyoming gives the governor the power to negotiate and enter into agreements with the federal government. And that's exactly what happened here. The other side views this as a very narrow thing, as if the governor signed a piece of paper, here you can have our jurisdiction. That's not what happened here. This was a wide-spanning agreement covering all the issues in dispute between the state and federal government at that time, 1949-50. The governor was directly involved. And at the end of that... You say directly involved. The governor, though, was not on site when these negotiations were taking place, was he? No, your honor, but his personal representative was. Okay, well, I mean, that could be a distinction with a difference, I think. Well, but, your honor, the documents that were delivered to the Secretary of the Interior provided this is from the governor. And that was the opening memorandum in April of 1949. In December of 1949, a revised version of the agreement was submitted on behalf of the governor. So the governor was directly involved, your honor. And then after the statute was adopted, there was this exchange relating to what would happen for the 1950-51 season. And again, the governor was copied on all these communications and himself personally sent telegrams. And I do want to read, I want to come back to this, from the head of the Wyoming Fish and Game Department, a letter to the Secretary of the Interior. And he says, I wired you yesterday, briefly setting forth the position of the Wyoming Game and Fish Commission relative to closing all hunting within the exterior boundaries of the newly created Grand Teton National Park. So this is, it's not an oral agreement, your honor, it's an agreement that's reflected not in a single document, but a number of documents. Mr. Bagley, the head of the Wyoming Game and Fish Department, was himself at the meetings in April of 1949. And the correspondence that we've submitted shows that he was offering changes to the legislation and it went through the process of being negotiated. He understood it to be that there would be no hunting anywhere within the exterior boundaries. Now I want to say something else, and that is, the Enabling Act expressly deals with this question as to elk. 16 U.S.C. Section 673C was part of the Enabling Act, and it provided that there would be this unique joint control of hunting of elk in the park. And it expressly said that hunting could be allowed under certain situations. And after the two parties, the state and feds, met and agreed as to the hunting for that season, each would adopt regulations for the part of the plan covered by their jurisdiction. I'm not quoting that exactly right, but it refers to each of their jurisdiction. What could that mean if it didn't mean the inholdings? And under canons of construction, why doesn't that cut against you? I'm sorry? Under canons of construction, why doesn't that cut against you? If it's specifically provided for elk, and didn't provide for anything else. No, your honor, that's because there was an agreement as to the elk, and there was an agreement that there was no provision to be provided for the other species. And this is reflected again in the correspondence immediately after the adoption of the statute, where the Secretary of the Interior says that. Also, so you have here a situation where the governor agreed to this overall compromise agreement, which was a major issue. I wanted to say one or two other things, one second at a time. Very quickly, and then wind it up. OK. The 1977 legislation only applied to state crimes. So it didn't provide, as Mr. Peterson said, everything in the park. It only provided the federal government with the authority under the Assimilative Crimes Act to prosecute state crimes on the federal property. Also, the 1949 regulation did not allow hunting on private lands. It was very vague, and it said, you can use your land any way you want. Only reference private land, not state land. How do we know that? Well, it didn't say it. But secondly, in the Brown case, the indictment was for hunting on state lands. Thank you very much, Ross. We'll review that carefully. Yes, please, quickly. I appreciate your generosity with the time. Very briefly, the court has had a couple of dialogues here about the government perhaps should have known that Brown and Armstrong were on the books and thus engaged in an inquiry. I just point out, the government should not only have known they were on the books, the government argued those cases. The government was the prosecutor in Brown and Armstrong pushing for a finding of session in those cases where there was no explicit session statute, and indeed, the only statute referenced lands, not waters, and the prosecution was about waters. And then to turn around in this situation against this backdrop and not even look at the circumstances of the state-federal agreement is a failure to consider a relevant factor. On that basis, we believe remand is appropriate. Thank you very much for your time this morning. Thank you. And counsel, do you have a quick answer to that? Because the time is over. If I could, I would like to just respond to one point Mr. Rosenbaum made. And that's on the elk hunting statute as it properly indicated that the statute recognized a division of jurisdiction between the Park Service and Wyoming. It said make the rules to implement the plan within your area of your respective jurisdiction. Congress recognized that there was separate jurisdiction within the park, and it indicated that that separate division would continue. So that provision actually undermines the argument that Congress expected or thought there was a statute. Thank you, counsel. I don't want anybody to leave here and feel they didn't get a chance to get their arguments in. Thank you. Thank you. Counsel are excused.